

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

November 3, 2017

**BY ECF**

The Honorable William H. Pauley III
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, NY 10007

Re:   United States v. Luis Diaz, Jr., et al.,17 Cr. 077 (WHP)

Dear Judge Pauley:

The Government respectfully submits the following in support of its request to offer evidence that certain individuals who received funds from the defendants as part of the charged money remitting and money laundering schemes are current or former employees of the Venezuelan government, or otherwise closely affiliated with Venezuelan government agencies. As detailed herein, those facts bear substantial relevance to the case and will be offered solely for the permissible purposes of establishing a motive for, and potential harms flowing from, the charged crimes as well as to rebut anticipated defense arguments.

As the Court is aware, the upcoming trial will center on allegations that the defendants used bank accounts under their control to operate an unlicensed money transmission business. Evidence will establish that the defendants routinely received inbound wire transfers from companies based in Latin America, including a large consortium of Venezuelan construction companies known as KCT before remitting those payments on to third parties around the world (the "payees"). To mask the role of the KCT, which is identified in the Complaint as the "Venezuelan Company," and others in the transactions, KCT made – and the defendants maintained – fake invoices purporting to reflect "consulting services" or "professional services" that the payees had provided to the defendants, thus justifying the funds the defendants were sending to the payees at the direction of KCT.

Among the many individuals who received funds in this manner through the defendants' bank accounts were at least five individuals either employed by or closely affiliated with Venezuelan government agencies with clear relevance to the business of KCT. These payments, which have been an important part of the Government's case since the filing of the criminal complaint, (*see* Dkt. No. 1 ¶¶ 45-51,) were all made as part of the charged scheme – that is, as funds sent from KCT and passed through the defendants' bank account – and were made pursuant to fake invoices recovered from the defendants' offices, which purport to document the "consulting" or "professionals services" these Venezuelan government officials ostensibly provided to the defendants and their company.

In particular, the Government intends to offer evidence regarding the following five payees, among others:

*First*, the Government intends to offer evidence at trial that the defendants used their bank account to remit hundreds of thousands of dollars from KCT to Fidel Ramirez, who is identified in the complaint as VG Official-1.  They did so pursuant to sham invoices provided by KCT, but purporting to have been created by Ramirez and addressed to the defendants, seeking fees for "Consulting Professional."  A copy of that invoice is attached hereto as Exhibit A.[1]  If permitted, the Government would further elicit that, at the time, Ramirez was a Venezuelan government employee, and that his brother was the Venezuelan Minister of Energy.

*Second*, the Government intends to offer evidence at trial that the defendants funneled more than $600,000 from KCT to "Sumus, Inc.," a company based in the British Virgin Islands. The defendants, once again, did so pursuant to a sham invoice provided by KCT, but purporting to reflect "Professional Services" provided by Sumus to the defendants.  A copy of that invoice is attached hereto as Exhibit B.  If permitted, the Government would further elicit that Sumus' sole director was Ali Matute, who was at the time, an employee of CADAFE, a state-owned energy and electric company.

*Third*, the Government intends to offer evidence at trial that the defendants remitted funds on behalf of KCT, on multiple occasions, to Teddy Peralta, who is identified in the complaint as VG Official-3.  The defendants did so pursuant to a sham invoice provided by KCT, but purporting to reflect "Professional Service[ ]" provided by Peralta to the defendants.  A copy of that invoice is attached hereto as Exhibit C.  If permitted, the Government would further elicit that Peralta was, at the time, an employee of PDVSA, the Venezuelan state-owned gas and energy company.

*Fourth*, the Government intends to offer evidence at trial that the defendants remitted funds on behalf of KCT on multiple occasions to Mario Vegas, both directly and through a company under his control, doing so, in each instance, pursuant to sham invoices provided by KCT, but purporting to reflect professional services.  A copy of one such invoice is attached hereto as Exhibit D.  If permitted, the Government would further elicit that Vegas was, for at least a portion of the charged conspiracy, an employee of CADAFE, the state-owned energy and electric company described above.

*Fifth*, the Government intends to offer evidence at trial that the defendants remitted funds on behalf of KCT to an escrow company in the United States for the purpose of purchasing a condominium for Enrique Rafael Cid, who is identified in the complaint as VG-Official-4.  The defendants did so pursuant to a sham invoice provided by the escrow company and maintained by the defendants, purporting to reflect that the escrow company had provided "engineering services" to the defendants.  A copy of that invoice is attached hereto as Exhibit E.  If permitted, the Government would further elicit that Cid is an advisor to CorpoElec, the Venezuelan government owned electricity company.

---

[1] All of these invoices will be presented at trial along with English translations.

To be sure, the fact that a Venezuelan construction company was repeatedly passing money pursuant to sham invoices through the defendants' bank accounts to individuals employed by or affiliated with Venezuelan government agencies – ones working in the same areas in which KCT operated – might lead a reasonable juror to conclude there was something suspicious about these transactions.  But that is precisely the point – the Government intends to establish, through a witness from U.S Department of Treasury's Office of Financial Crimes Enforcement Network ("FinCEN"), that legitimate, licensed money remitters are required to have compliance and anti-money laundering programs in place so that they can detect and then report suspicious activity through their accounts as required by law.  The Government also anticipates establishing that the defendants had no such compliance program and at no point reported suspicious activity by way of a suspicious activity report ("SAR") or otherwise.  That the defendants allowed these transactions to flow freely through their accounts – without asking any questions, let alone attempting to stop or report this suspicious activity – is direct evidence of the harm caused by the defendants as a result of their failure to register with the U.S. Treasury as required by law and operate in accordance with the regulations imposed on legitimate financial institutions, including money transmitters.

Second, and related, the suspicious nature of these transactions, coupled with the reporting requirements imposed on legitimate financial institutions, helps establish the motives of the defendants and their co-conspirators in Venezuela.  In particular, the fact that legitimate financial institutions might well have flagged these transactions and/or asked questions about the propriety of the payments will help the jury understand why KCT passed these payments through the defendants and their bank accounts, rather than attempting to transfer the money directly.  It similarly explains why the defendants kept sham invoices purporting to explain the payments, and why they were able to charge significant fees for their services.

Third, evidence of the identities of the payees should be permitted to rebut anticipated defense arguments that the payments at issue in this trial served legitimate business purposes.  For example, as defense counsel told the Court in argument last week, the defendants' position is that "the money always came from Venezuela, from people that were known to the Diazes for decades in this case, *legitimate people, legitimate money*."  (10/25/17 Tr. at 11 (emphasis added).)  Assuming that remains a defense argument at trial, the Government should be entitled to rebut that notion – that these were legitimate business transfers – with evidence that would permit a reasonable juror to conclude otherwise.

To be clear, the Government has no intention of arguing that the defendants were themselves attempting to bribe Venezuelan government officials, or that they were knowing participants in such schemes.  Indeed, the Government would have no objection to such a limiting instruction in this regard making clear that the defendants are not charged with such conduct.  Nor does the Government intend to elicit any evidence about any harm caused in Venezuela as a result of any of these payments.   Instead, the evidence would be offered exclusively to establish core components of the charged crimes – namely the manner in which the defendants' conduct failed to comply with the requirements imposed on legitimate money transmitters, as well as the motive of the defendants and their co-conspirators in evading the legitimate U.S. financial system.  To the extent the Government will argue about the harm of that conduct, it will focus such arguments exclusively on the harm caused in this country to the sanctity of the U.S. financial system.

Finally, and as indicated at the final pretrial conference, the Government does not intend to elicit any more testimony about the identities of these Venezuelan officials than described above.  The Government is prepared to do so through an expert witness with knowledge of the Venezuelan Government, but would be amenable to doing so instead through the testimony of a law enforcement agent or lay witness (where possible), or through a stipulation.

Respectfully submitted,

JOON H. KIM
Acting United States Attorney for the
Southern District of New York

By:      /s/ 
Edward B. Diskant
Daniel M. Tracer
Benet J. Kearney
Assistant United States Attorneys
(212) 637-2294/2329/2260

Cc (by ECF):  All Counsel of Record

4