HapWdiaC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                          17 Cr. 77 (WHP)

5
    LUIS DIAZ, JR.
6   and LUIS JAVIER DIAZ,

7
                                          Oral Argument
8              Defendants.

9   ------------------------------x

10                                        New York, N.Y.
                                          October 25, 2017
11                                        2:15 p.m.

12
    Before:
13
                    HON. WILLIAM H. PAULEY III,
14
                                          District Judge
15

16                        APPEARANCES

17  JOON H. KIM
         Acting United States Attorney for
18       the Southern District of New York
    EDWARD B. DISKANT
19  BENET J. KEARNEY
    DANIEL M. TRACER
20       Assistant United States Attorneys

21  VICTOR J. FLYNN
    GEORGE J. VILA
22       Attorneys for Defendant Luis Diaz Jr.

23  JOSE M. QUIÑON
         Attorney for Defendant Luis Javier Diaz
24

25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

HapWdiaC

```
 1              (Case called)
 2              MR. DISKANT:  Good afternoon, your Honor.  Edward
 3    Diskant, Daniel Tracer and Benet Kearney, for the government.
 4              THE COURT:  Good afternoon.
 5              MS. KEARNEY:  Good afternoon.
 6              MR. QUIÑON:  Good afternoon, your Honor.  Jose Quiñon,
 7    on behalf of Luis Javier Diaz, who is present before the Court.
 8              THE COURT:  Good afternoon to you, Mr. Quiñon, and I
 9    note the presence of Mr. Diaz at counsel table.
10              MR. QUIÑON:  Thank you, sir.
11              MR. FLYNN:  Good afternoon, your Honor.  Vincent Flynn
12    and George Vila, on behalf of Mr. Luis Diaz Jr., who is
13    present.
14              THE COURT:  Good afternoon, gentlemen.  I note the
15    presence of Mr. Diaz Jr. at counsel table as well.
16              This is a final pretrial conference.  We have a number
17    of matters to consider this afternoon.  First, the government
18    filed certain motions *in limine*, and the defendants made an
19    application for a *Daubert* hearing.  Do counsel wish to be heard
20    with respect to these matters?
21              MR. DISKANT:  Your Honor, the government is certainly
22    happy to answer any questions the Court has about them.  I
23    think we're otherwise prepared to rest on our papers.
24              THE COURT:  Why does the expert have to testify about
25    harm to the Venezuelan economy?
```

HapWdiaC

1              MR. DISKANT:  Your Honor, the government would like to

2     be able to elicit a limited amount of testimony about the harm

3     to the conduct at issue here, because we anticipate that one of

4     the defenses is going to be, or a defense theme is going to be,

5     the absence of any sort of harm as a result of this criminal

6     conduct.  So we believe that it's important for the government

7     to elicit only a limited amount.  We're not planning to dwell

8     on it.

9              THE COURT:  Why anything with respect to the

10    Venezuelan economy?  Why wouldn't it be more important to

11    elicit testimony regarding harm to the United States?

12             MR. DISKANT:  Because the primary harm -- that's a

13    fair question, your Honor.  We certainly plan to elicit

14    testimony in that regard.  We will be calling someone from the

15    Treasury department, from FinCEN to talk about banking

16    regulations and the like.  In some respects, though, the more

17    human aspect of the harm does befall on the Venezuelan side of

18    the equation, which is why we wanted to be able to let the jury

19    understand -- it's part of the story, which is to say that part

20    of the reason why the coconspirators based in Venezuela are

21    paying the defendants' fee and using the defendants, as we

22    allege, to move money into the country is because of what is

23    going on in Venezuela.  So while there certainly is a harm to

24    the United States and we intend to offer evidence of that, we

25    do believe that a limited amount of evidence regarding what is

HapWdiaC

1    happening on the ground in Venezuela is necessary.

2           We should note, along those lines, that we anticipate,

3    and alluded to this in our papers, separate and apart from the

4    expert, we will be calling one or two witnesses who are

5    themselves Venezuelan and who were participants in one shape,

6    form or another in this conduct who will testify from a lay

7    perspective about the fact that there are these currency

8    controls in place and that it's extremely hard to get dollars

9    and what that means, which is a core part of the harm at issue.

10          THE COURT:  All right.  Anything else on that point?

11          MR. DISKANT:  Not from the government.

12          THE COURT:  Let me hear from the defendants.

13          MR. QUIÑON:  Your Honor, on that point, we did ask for

14   a *Daubert* hearing.  We don't think this witness would be

15   qualified to speak to the harm of the Venezuelan economy as

16   such, first of all.  And second of all, I think that your Honor

17   brought out the point that we were going to bring out as well,

18   which is that's not the issue in this case, harm to the

19   Venezuelan economy.  That's not part of the indictment as such

20   in this case.  This is a 1960 offense that deals with our

21   banking system and our laws, and so we think that this is an

22   area that clearly an expert should not be allowed to testify.

23          And quite frankly, just because he was born in

24   Venezuela and teaches at a Venezuelan university does not mean

25   that he's qualified to testify about the harm to the Venezuelan

HapWdiaC

1    economy.  How do you quantify that in a country where you have

2    a dictatorship, essentially?

3             THE COURT:  In a country that's in turmoil.

4             MR. QUIÑON:  Right.

5             THE COURT:  I've got it.  Let me ask you this, though.

6    With respect to your application for a *Daubert* hearing, why is

7    a *Daubert* hearing necessary if the proposed expert has relevant

8    background experience to testify about general topics, like the

9    Venezuelan currency controls?

10            MR. QUIÑON:  Again, we don't know to what extent he is

11   familiar with the Venezuelan currency controls.  There have

12   been a lot of changes.  For example, the one that has been

13   stressed the most, Cadivi, has gone through a number of layers

14   that are not set forth in any of the documents to any extent in

15   this case, and we need to find out to what extent is this

16   something that he's familiar with?  Because he is Venezuelan,

17   he reads it in the newspaper as much as I do?  Or does he teach

18   it, or how does he know?

19            We don't have any of that at hand, so we wanted to

20   find out what it is that constitutes that source of knowledge

21   for this particular individual.  And that's the reason why we

22   felt that it's necessary.  We don't expect that it would be an

23   extensive hearing, but before he takes the stand, I think it

24   would be something that we would like to know and should know,

25   because he may not be qualified and therefore should not

HapWdiaC

1    testify, and that's the reason why we object.

2              THE COURT:  All right.

3              Mr. Flynn.

4              MR. FLYNN:  Nothing further, your Honor.

5              THE COURT:  All right.  Mr. Diskant.

6              MR. DISKANT:  Your Honor, to the point that defense

7    counsel was just making, we actually flagged that specific

8    issue in his expert report.  The expert has enormous knowledge

9    about the changes in the Cadivi and could talk about them at

10   some length.  We were not planning to elicit all of that detail

11   because we, frankly, think it is beyond the scope of what is

12   necessary for this particular jury, but certainly if defense

13   counsel wants to explore the witness's knowledge of that

14   particular subject and the basis for that knowledge on

15   cross-examination or otherwise, the government has no objection

16   to that.

17             THE COURT:  All right.  Anything further with respect

18   to the government's motions *in limine* or the defendants'

19   request for a *Daubert* hearing?

20             MR. DISKANT:  No, your Honor.

21             MR. QUIÑON:  On that motion, no, your Honor.  On the

22   ledger we have a few matters.

23             THE COURT:  Let me hear what you have to say on the

24   ledger.

25             MR. QUIÑON:  Yes.  On the ledger, if your Honor gives

HapWdiaC

1    me a second here, importantly, what we have, and I know the

2    Court requested the ledger, and you have it, that's all that

3    we're aware is in the possession of the government.

4           Now, as to the ledger, there is no evidence at all

5    that I'm aware of that the government has in their possession

6    that that individual, the target that they mention from whom

7    the money was seized, had anything to do either with the Diazes

8    or with anybody in this so-called conspiracy.  So to call him a

9    coconspirator in the government's submission, I think, goes too

10   far based upon solely finding a document that has Miami

11   Equipment and a bank account number.  It doesn't even have

12   numbers that were deposited or dates they were deposited.

13          There's no evidence at all that that individual

14   deposited any money in the accounts at this point based upon

15   that single-page document that was found.  And there's no nexus

16   between that ledger -- we don't know who did it, who prepared

17   that single page, how it got there.  We don't know any of that,

18   and it is important, because our contention is that that

19   document, for example, could have been, maybe there was an idea

20   that in the future they were going to deposit.  I don't know

21   what it is.  We don't know who prepared it, we don't know what

22   were the circumstances.  It is, in our opinion, hearsay, and to

23   say that it's not being sought to be admitted for the truth of

24   the matter, I think that that, quite frankly, doesn't fly,

25   because even the government, in their pleading, does say that,

1   but then toward the end of the pleading says that the ledger

2   basically goes on to prove or helps to prove that this was an

3   unlicensed money-transmitting business.  So you can't have it

4   both ways.

5          It definitely is something the government wants to

6   bring in for the truth of the matter, but it's hearsay.  It has

7   no way to come in, and again, the biggest point is there's no

8   nexus.

9          THE COURT:  Right, but if the government establishes

10  the existence of a conspiracy and that CC1 is part of the

11  conspiracy with the defendants, wouldn't it come in as an

12  admission by a coconspirator?

13         MR. QUIÑON:  That's my point.  They have no evidence

14  that that individual is involved in this conspiracy.  There is

15  no evidence at all that that individual knew the Diazes or knew

16  any of the so-called other individuals involved in this

17  conspiracy, the conspiracy that was indicted, the one before

18  the Court.  That individual may have been involved, CC1 may

19  have been involved in a conspiracy, but not this conspiracy,

20  because he doesn't know anybody.  There's no evidence at all of

21  that.  There's no nexus between CC1 and the Diazes other than

22  that one single piece of paper, and we don't know where it

23  emanates from.  We don't know whether CC1 prepared it or

24  somebody else.  We don't know where he got it.

25         Now, interestingly, the government, when they did the

HapWdiaC

search warrant in CC1's business, this restaurant, according to

their pleading, found other records that indeed had numbers,

bank accounts and apparently deposits that were made.  But none

of them dealt with the Diazes.  So there's no nexus, and that's

the problem.  You have a single piece of paper that was found,

which does not appear -- we don't know who prepared it, what

were the circumstances, and now the government is taking that

and putting a DEA agent on the stand, which is going to be very

damaging, just by virtue of the fact that he is a DEA agent.

The inference that goes to the jury, because he works for the

Drug Enforcement Administration in a case, quite frankly, that

the Diazes are not involved at all in anything to do with

drugs.

        It's extremely, highly prejudicial, and there's no

nexus between CC1, the Diazes or anybody else involved in this

case, none of those people from Venezuela that the government

intends to call in this case.  No nexus at all.  All we have is

a single piece of paper that was found back in 2011, and we

don't know how it got there, who prepared it, or what.

        THE COURT:  Mr. Flynn, do you care to amplify defense

counsel's argument?

        MR. FLYNN:  No, your Honor.  We're not going to

belabor the Court with repetitious arguments.

        THE COURT:  All right.

        Mr. Diskant.

HapWdiaC

1          MR. DISKANT:  Your Honor, the primary nexus is the

2     fact that he had the defendants' bank account on this piece of

3     paper in his business in which he also had several hundred

4     thousand dollars in cash.

5          THE COURT:  Will CC1 testify at trial?

6          MR. DISKANT:  He will not, your Honor.

7          THE COURT:  Why not?

8          MR. DISKANT:  CC1 is no longer in the country.

9          If I may, Judge, the evidence in the case will

10    establish that most of the individuals who either received or

11    to some degree sent money through the defendants' account don't

12    know the defendants.  That was actually the nature of the

13    scheme.  The important fact, from the government's perspective,

14    consistent with the other evidence it will present, is that it

15    was known in a certain community that the defendants' bank

16    account was open for this type of business; that is, you move

17    money into their account and you send them instructions on how

18    to move money out.  So offering the fact that another

19    individual, who just based on the testimony of what the agent

20    observed and what was recovered -- there will be no mention of

21    narcotics, and in fact, if defendants prefer, we can call him

22    as from a federal agency, who recovered a ledger and a

23    significant amount of cash, is probative of the fact that the

24    defendants were, in fact, involved in this sort of activity;

25    that is, accepting deposits and moving money on behalf of other

HapWdiaC

1   people, which is precisely the crime they are charged with.

2           MR. QUIÑON:  Judge, we do take issue with the

3   statement that the defendants did business with these people

4   that they did not know.  That's not the case.  That's not

5   what's going to be, I believe, presented to the jury.

6           The money that came into the defendants' bank account

7   came from Venezuela from the KCT individuals.  These are

8   individuals who are very wealthy in Venezuela who do business

9   in the hundreds of millions of dollars with the government of

10  Venezuela, legitimate construction people, who were sending

11  money to the Diazes' business.  From there, the Diazes were

12  instructed to give money to some individuals that they did not

13  know.  That part is true, and the government can call

14  individuals that were not known, known to the Diazes, who were

15  recipients of the money, but the money always came from

16  Venezuela, from people that were known to the Diazes for

17  decades in this case, legitimate people, legitimate money,

18  which is an entirely different case from this situation with

19  this other individual, CC1.

20          CC1 is an anomaly in this case, from our point of

21  view.  It's an entirely different picture in this case and one

22  that, quite frankly, threatens to swamp the whole case and

23  really with prejudice for the Diazes.

24          The Diazes were doing business with people that they

25  have known, again, for decades.  Legitimate business people

HapWdiaC

1    send them money.  Yes, the Diazes agreed to, and we will admit

2    in front of the jury, that we gave money to people that we did

3    not know at the instruction and at the behest of people from

4    Venezuela with whom we were doing business, not

5    money-transmitting business.  We were doing business in the

6    hundreds of millions of dollars for them, and you will see when

7    the trial evolves that there was a business relationship for

8    many years where the Diazes acted in many ways helping those

9    people from Venezuela, and that's their business in Miami.  So

10   this issue with CC1 is an anomaly.  It's a totally different

11   animal, and again, a very dangerous animal, from our point of

12   view, because CC1 is someone the Diazes never dealt with, don't

13   know, and CC1, I contend, doesn't know anybody else involved in

14   the flow of money to the Diazes, and he's not a coconspirator,

15   with all due respect.

16         THE COURT:  If the government doesn't offer it for its

17   truth, could the government offer it for some associational

18   purpose?

19         MR. QUIÑON:  They could if CC1 was known to the

20   Diazes.  If the Diazes knew CC1 or if CC1 knew, for example,

21   the principals of this business in Venezuela, I mean, yes,

22   under those circumstances.  But we don't know.  CC1 is not

23   available, according to what the government just informed the

24   Court, and all we have is a single piece of paper that was in

25   the possession of CC1, but we don't know whether he got it from

HapWdiaC

somebody else.  When did he get it?  What were the

circumstances that he got it?  What was he supposed to do with

it?

         We don't know any of that.  But the government is

taking that single piece of paper now and stretching it to the

point of saying that CC1 is a coconspirator of the Diazes.  You

can't do that.  That's really, A, extremely prejudicial; B,

there's no nexus here to make that connection, and that's what

they seek to do.  And we think that the ledger, for that

reason, that single paper -- we call it a ledger, but really

it's a single piece of paper -- from one location shouldn't

come in under those circumstances.

         THE COURT:  All right.

         Anything further, Mr. Diskant?

         MR. DISKANT:  Your Honor, just two brief things.

         First, and the Court alluded to this, the government

is prepared to offer it for the fact of the association, not

for its truth.  Our initial position on this was it was hearsay

because the ledger is not being offered for any assertion; it's

being offered for the fact.  And here the fact is someone who

was involved in handling large cash deliveries and large cash

transactions had in his business at the time a ledger listing

numerous accounts, including one of the defendant's accounts.

We submit that would be very similar to a lot of the other

evidence that is going to be offered during the trial, which

HapWdiaC

1    the defendants concede will involve numerous other instances in

2    which they were moving money to people they didn't know.

3              THE COURT:  But isn't that hearsay?

4              MR. DISKANT:  Which part?

5              THE COURT:  It asserts that a transaction actually

6    occurred, doesn't it?

7              MR. DISKANT:  The ledger itself does not.  The ledger

8    itself asserts that someone who was involved in that conduct

9    had the defendants' name and bank account with him.  To the

10   extent the government were to argue further, it would have to

11   argue further based on reasonable inferences to be drawn from

12   the evidence.

13             Moreover, even going beyond that, the government

14   believes that we can lay a foundation for him as a

15   coconspirator if the Court is concerned about this issue,

16   because again, there are going to be numerous witnesses who

17   will testify, people in the United States, that they received

18   money from the defendants; that they therefore had the

19   defendants' bank account and their names, despite the fact that

20   they had never heard of Miami Equipment, despite the fact that

21   they had never heard of either of the defendants, because they

22   were doing business with a company in Venezuela that had chosen

23   to send them money through the defendants' company.  So in that

24   respect, the fact that this person in New York was, as the

25   defendants say, is unknown to them is somewhat immaterial,

HapWdiaC

because the government's allegation here, and it seems like the

defendants are conceding as much, is that they were moving

money to individuals they did not know.

MR. QUIÑON:  Just one last thing.

CC1 is a different scenario.  He's not receiving

money.  He's supposedly sending money.  It's a totally

different scenario, No. 1.

No. 2, your question initially was, Aren't you using

this as hearsay to assert the truth of the matter?  Page 8 of

the government's response in this case, and I'm going to read

it, states, "To be sure, evidence of the ledger is prejudicial

inasmuch as it constitutes evidence that the defendants were

operating an unlicensed money-transmitting business."

In other words, that's what they're going to use this

one single piece of paper to show, that the defendants were

operating an unlicensed money-transmitting business.  That is a

pure hearsay use of this document, and it's just hearsay.

Again, there's not much for the government to grapple with this

one single piece of paper.  They don't have any evidence what

the purpose of that paper was, who put it together, how it got

there, whether somebody gave it to CC1.  Nothing.  Just one

single piece of paper, and now they're going to use that single

piece of paper to say, basically, that it shows proof that our

clients were running an unlicensed money-transmitting business.

Again, that's a hearsay use.  It's a hearsay document

HapWdiaC

1    under those circumstances.  We think it should be excluded in

2    this case, Judge.  It's very different from the case.  This

3    case really is going to be about money that is coming in from

4    Venezuela from that source.

5          THE COURT:  And are you telling me that CC1 was

6    involved with money going out, sending money?

7          MR. DISKANT:  He was involved in both.  Money

8    transmitters move money to and from.

9          The government anticipates that it will offer

10    testimony primarily in the form of him and the money drop at

11    which he is delivering money to a DEA agent.  That's money he

12    presumably received from somewhere, and then he was involved in

13    transmitting money.  I mean, conceivably, it could have been

14    either, but the fact that he was involved in moving money

15    around on behalf of others and he had the defendants' bank

16    account and their names in his possession, we believe, is

17    entirely consistent with the government's theory of what the

18    defendants were doing, which is allowing their bank accounts to

19    be used by people willing to pay them a fee in order to move

20    money on behalf, sometimes, of people they did not know.

21          MR. QUIÑON:  Judge, one last point on that, and the

22    Court knows this, CC1 is in New York.  The defendants' business

23    is in Miami.  Again, no evidence at all that they know each

24    other.  No evidence at all that CC1, if he is transmitting

25    money to anybody or receiving money from anybody, no evidence

HapWdiaC

1    at all that it was from the Diazes in this case or from anybody

2    involved in this conspiracy.  There is no evidence other than

3    one single piece of paper.  That's it.  And nobody explains

4    what that single piece of paper means.

5         The problem is when you put that out for grabs to a

6    jury, you're really putting out for grabs these peoples' lives,

7    on speculation.  And when we walk into a courtroom, the

8    government has great credibility by virtue of the fact that

9    they represent the U.S. government, and so we shouldn't really

10   put the Diazes' lives at stake on that type of evidence in this

11   case.  The government actually has other evidence that they're

12   asserting is money-transmitting business.  We can try the case,

13   but not on speculation, not on that type of evidence.

14        THE COURT:  All right.  I think it's important for the

15   parties that I do my best to rule on some of these matters now.

16        First, with respect to the ledger, I'm going to

17   reserve decision on the government's application to receive the

18   ledger in evidence.  This colloquy with counsel this afternoon

19   has persuaded me that I need to hear a lot more in the course

20   of the trial before I can make an informed decision on that

21   application.

22        With respect to the government's application *in limine*

23   to admit background evidence regarding Venezuelan currency

24   controls, the black market for U.S. dollars and schemes to

25   circumvent controls, the government seeks principally to offer

HapWdiaC

```
 1   the testimony of Professor Lansberg-Rodriguez, a dual

 2   U.S.-Venezuelan citizen, who's worked for the Venezuelan

 3   government, conducted extensive research and advises a number

 4   of financial institutions on country conditions in Venezuela.

 5          Venezuela currency controls and the consequences

 6   resulting from such controls, like a black market for foreign

 7   currencies or the schemes used to avoid detection by such

 8   controls, is a topic that would exceed an average juror's

 9   understanding.  An explanation or primer on these concepts

10   would be helpful to the jury in this action.  The alleged

11   schemes underlying the charged conduct exist in large part to

12   circumvent currency controls.

13          The government's expert, in this Court's view, is

14   qualified to provide his testimony in view of his substantial

15   personal and professional experience, working in Venezuela and

16   analyzing the effects of these controls.  In sum, providing

17   relevant background and context through which the jury can

18   assess the facts of this case is entirely appropriate.  See

19   United States v. Bourne, 2011 WL 4458846 at *8 (E.D.N.Y. 2011);

20   and United States v. Daccarett, 6 F.3d 37 at 58 (2d Cir. 1993).

21          Now, with respect to that portion of the government's

22   request that seeks to admit the expert testimony regarding the

23   harm on the Venezuelan economy, that branch of the government's

24   application is denied.  The focus of the charged conduct should

25   be on the harm to the United States, and any ancillary harm on
```

HapWdiaC

other markets would distract the jury from the relevant issues

in this case.  And obviously the whole state of the Venezuelan

economy and its government and the welfare of its people is a

matter very much in the news and not the place where this trial

should be going.

Now, the defendants seek a *Daubert* hearing to assess

the reliability and qualifications of the proposed expert, but

that is entirely unnecessary here.  It is well settled, and I'm

quoting, "The Second Circuit has taken a liberal view of the

qualification requirements of Rule 702 at least to the extent

that a lack of formal training does not necessarily disqualify

an expert from testifying if he or she has equivalent relevant,

practical experience."  *In re Rezulin Products Liability

Litigation*, 309 F.Supp.2d 531 at 559 (S.D.N.Y. 2004).

All the Court is required to do is assess the

reliability of the proposed testimony in light of the issues

that the jury will be required to process, and absent any

indication that the government's expert is unqualified or has

relied on inaccurate or incompetent evidence to support his

views, there is no need to conduct a *Daubert* hearing.  *United

States v. Williams*, 506 F.3d 151 at 161 (2d Cir. 2007).  There,

the Second Circuit observed, and I'll quote, "While the

gatekeeping function requires the district court to ascertain

the reliability of the expert's methodology, it does not

necessarily require that a separate hearing be held in order to

HapWdiaC

1    do so."

2        Accordingly, the government's motion to call the
3    professor is granted.

4        Now, in that regard, I should note for the parties
5    that in advancing this witness to the stand, or any other
6    expert, please do not ask me to qualify the expert.  I do not
7    give product endorsements.  I will simply permit the jury,
8    under Rule 702, to hear this witness's testimony because it
9    involves an area of specialized knowledge that I find might be
10   helpful to them, and that's generally the way I phrase it.

11       Now, the government, I think, separately offers to
12   introduce bank records and fake invoices, and if properly
13   authenticated, they're also admissible to establish general
14   context for the jury.  Such documents would highlight how the
15   schemes to circumvent Venezuela's currency controls actually
16   work.  Here, the bank transfer records reference the phrase
17   "Cadivi return," supporting the view that the transfer at issue
18   was designed to avoid detection by the principal Venezuelan
19   agency responsible for promulgating currency controls, and the
20   fake invoices reveal the mechanism through which intermediaries
21   facilitated Venezuelan entities in laundering money through
22   offshore accounts.

23       Accordingly, the government's motion to admit such
24   evidence for the purposes of establishing background and
25   context for the jury is granted.  And as I've said, I'm

HapWdiaC

1    reserving on the ledger.

2         MR. QUIÑON:  Judge, in connection with the expert, I

3    just want to make sure, I know there's been language in the

4    government's pleadings, and I'm looking at page 6 of the latest

5    one that they filed, their memorandum, and it kind of leads me

6    to believe, and I may be wrong, that they're going to ask this

7    expert witness, Professor Lansberg, to identify certain

8    individuals who may be connected with this case.

9         I don't know if they're still traveling in that

10   direction or not.  If they are, we object to that.

11        THE COURT:  This professor is not going to be

12   commenting on the evidence in this case, correct, Mr. Diskant?

13        MR. DISKANT:  That's correct, your Honor.

14        I think what defense counsel is alluding to is there

15   are certain names that are going to come up in the course of

16   this case that are the names of commonly known Venezuelan

17   government officials.  We would not expect the jury to have

18   that sort of knowledge, because they are Venezuelan government

19   officials and not American government officials.

20        THE COURT:  Don't assume that an American jury will

21   know who the American government officials are.

22        MR. DISKANT:  Fair enough, but we do plan to elicit

23   from the witness that Joe Smith is a commissioner of such and

24   such in the department of whatever in Venezuela.  We're not

25   going to get into any of the particular facts of how that name

HapWdiaC

1    ties into the facts of this case with the expert.

2            THE COURT:  What's wrong with that, Mr. Quiñon?

3            MR. QUIÑON:  Judge, again, it brings the witness into

4    commenting on the facts of this case.  I mean, we're going to

5    have some of those names come up.  Now, it puts us in a

6    position, Do we or don't we cross-examine the expert on this

7    issue about the official?  I mean, this case is really not

8    about government officials.

9            THE COURT:  But Mr. Diskant, can't the government

10   bring out the evidence of who certain government officials are

11   in Venezuela through some fact witness in the case?

12           MR. DISKANT:  I guess conceivably we could, your

13   Honor, but I don't understand why defense counsel thinks that

14   would be any less objectionable.

15           All we're trying to establish, and perhaps we can just

16   stipulate to this.  All we're trying to establish is that

17   certain individuals whose names are going to come up during the

18   trial have a particular title in the Venezuelan government,

19   something an American jury could not possibly be expected to

20   know.

21           MR. QUIÑON:  Here's my question, then.

22           THE COURT:  What about a stipulation?

23           MR. QUIÑON:  At heart, here's my objection, the real

24   objection.  What difference does it make whether the individual

25   is a government official or he or she is not a government

HapWdiaC

official or they work at the airport?  That's not part of the

elements of the crime.  Really, the crime here is the movement

of the money.  Whether the individual who received the money is

a government official or not is not part of this case, and I

tell you why that is important to us.

        The clients in this case, the individuals who are

accused in this case, are not Venezuelans.  They do not live in

Venezuela.  They were not at all involved in contracting,

whether with government officials or anybody else, and now

we're put in a position where if you bring out before the jury,

under these circumstances, these are government officials who

received money, what is the jury to think other than, what,

they got bribed?  Obviously.  That's the dangling inference out

there, but that's not what we're here for.  That's not the

charge.

        This is a 1960 charge, which is money transmitting

here in the United States, nothing to do with whether or not

there is corruption in Venezuela or whether the Venezuelans who

sent the money to the Diazes bribed another Venezuelan in

Venezuela.  We have no control over that.  We have no knowledge

of that, the Diazes do not.  And now the government is doing it

in a very skillful way where basically the inference is,

Ah-hah, the Diazes must have been involved in some type of

corruption, because otherwise, why would the government

officials of Venezuela receive money in this matter?

HapWdiaC

1          Again, to repeat myself, and I'll leave it at that --

2          THE COURT:  You don't have to repeat yourself.

3          MR. QUIÑON:  Right.  It's obvious.

4          THE COURT:  All right.  I've got the point.  I'm going

5     to think about it.  I'm reserving.

6          Let me turn to some other matters.

7          First, with respect to the trial, we will bring the

8     jury out each day from 9:30 until 5:00.  We will take a brief

9     midmorning and midafternoon recess, and we will take a luncheon

10    recess from 1 until 2 each day.  We will work Monday through

11    Thursday with the jury, from 9:30 to 5.  Obviously, the first

12    week also includes Veterans Day.  We will not be sitting on

13    Friday, but the following week, if the jury is deliberating, we

14    will sit on Friday.  Otherwise, we will simply try the case

15    that second week as well with the jury from 9:30 until 5:00.

16    That means that counsel should plan to be in the courtroom at 9

17    a.m. to take up any issues that you think might be arising

18    during that day.

19          Sidebars are generally discouraged because they waste

20    jury time, and we can clear most of the wood, it seems to me,

21    about any issues between 9 and 9:30 in the morning or after 5.

22          If counsel believe that some evidentiary issue is

23    going to arise that involves a complicated question, you're

24    free to send me a letter about it so that I'm alerted to it

25    before I come on the bench and we can deal with it without

HapWdiaC

1    wasting the jury's time.  And you're free to email such letters

2    to us through my deputy so that we can review them.

3            In terms of courtroom demeanor, if you have an

4    objection to a question, stand up and state that you have an

5    objection.  Please do not make speaking objections.  If you

6    want to refer me to a rule number, that's fine.  If I don't

7    understand the basis of your objection, I'll ask.

8            Defense counsel need to be alerted to submitting an

9    electronic-devices order so that you can bring the equipment

10   that you want to bring into the courtroom with you, including

11   cell phones, but be sparing about the amount of devices that

12   you want to bring in.

13           Mr. Diskant, how many days does the government believe

14   it needs to present its case at this point?

15           MR. DISKANT:  Your Honor, the government has been

16   working with defense counsel.  We expect at this point the

17   parties are going to stipulate to things like custodians, which

18   substantially reduces the amount of time the government will

19   need.  As of right now, I think our best estimate is that we

20   will need five days for our case, so building in some time for

21   jury selection and closings and a potential defense case, I

22   think this is probably a two-week trial.

23           THE COURT:  All right.  Do either defense counsel have

24   any disagreement with that estimate?

25           MR. FLYNN:  No, your Honor.

HapWdiaC

1           MR. QUIÑON:  No.

2           THE COURT:  For purposes of jury selection, how many

3     alternates do the parties think we should select?  I'm inclined

4     to think three.  Any objection to that?

5           MR. QUIÑON:  No, your Honor.

6           MR. DISKANT:  No, your Honor.

7           THE COURT:  Mr. Flynn.

8           MR. FLYNN:  No, your Honor.

9           THE COURT:  All right.  Here's what we'll do.

10    Obviously, using the following method for selecting jurors, I

11    will impanel and qualify a total of 33 jurors.  The jury itself

12    will be selected from the first 28 seated jurors and the

13    alternates will be selected from jurors 29 through 33.  The

14    defendants will have ten challenges with respect to the first

15    28 jurors and the government will have six.  Those challenges

16    will be exercised in five rounds with the challenging party

17    alternating in each round, so the government will go first in

18    the first round and exercise two challenges, and then it will

19    have one challenge in each successive round.  The defendants

20    will go first in the second round and have two challenges in

21    every round.

22           Am I correct to assume that the defense counsel

23    consider the defendants' interests aligned for purposes of jury

24    selection?

25           MR. QUIÑON:  Yes, your Honor.

HapWdiaC

1         MR. FLYNN:  Yes, your Honor.

2         MR. QUIÑON:  Very much so.

3         THE COURT:  You'll decide among yourselves how you're

4    exercising your challenges in each round.

5         If one side or the other does not exercise its

6    challenges in a given round, that challenge is forfeited, but

7    if there are rounds remaining, they do not forfeit their right

8    to exercise any challenge they may be entitled to in a

9    subsequent round.  If all of the challenges are not exercised,

10   then the lowest seated 12 jurors among the first 28 will

11   comprise the jury.  Then we'll turn to the alternates, and

12   there will be five alternates.  Each side will have one

13   challenge addressed to the alternates, and the government will

14   go first.

15        Now, I think that you will find that I'm liberal when

16   it comes to excusing jurors for cause, and I may excuse a juror

17   for cause without consulting with counsel if, in my view, we

18   have a crazy person on the panel.  One of my functions is to

19   try to keep nuts off the jury.  All right?  But if during the

20   course of my voir dire any counsel believes that they have a

21   challenge for cause, you should feel free to be raising it with

22   me at any occasion when you're up at the sidebar during voir

23   dire, because I'd rather entertain those challenges early than

24   at the end of the process, so that when we reach the end of

25   voir dire, I want to be satisfied that I have 33 qualified

HapWdiaC

1    jurors in this case.  And I want you to be satisfied, so I'll

2    give you one last opportunity at that point to challenge a

3    juror for cause before we move to peremptory challenges.  I'll

4    give you a short break of about ten minutes to confer, or if it

5    happens to coincide with lunchtime, I will give you the lunch

6    hour to confer over your peremptories before you exercise them.

7            Are there any questions about how jury selection will

8    proceed?

9            MR. QUIÑON:  I do, your Honor.

10           THE COURT:  Sure.

11           MR. QUIÑON:  I'm sorry.  Every judge does it a little

12   bit differently, and this is like a critical part, obviously.

13           THE COURT:  Absolutely.

14           MR. QUIÑON:  I just want to make sure.  You mentioned

15   that you're going to impanel 28 for the jury.  Can I ask the

16   Court where the 28 will be?

17           THE COURT:  Sure.  Let me describe all of that.  I'm

18   going to impanel a total of 33.

19           MR. QUIÑON:  Right.

20           THE COURT:  Here's how it will proceed.  We will put

21   18 of them in the jury box.

22           MR. QUIÑON:  OK.

23           THE COURT:  And then No. 19 will be starting over by

24   the window in the first row; 19, I think, to 22 is usually the

25   way it falls out, depending upon the size of the jurors.  And

HapWdiaC

1    then 23 through 28 will be in the bench right behind defense

2    counsels' table.  All right?  And then the alternate jurors,

3    starting with 29, will be in the second row adjacent to the

4    window.  Sometimes we can get five in there and sometimes we

5    can't.  If we can't, that one extra juror or two extra jurors

6    will continue over in the second row.

7            What we will be doing during jury selection is

8    clearing those rows so that you'll have a firm view of who is

9    who and where they are.  And you'll find in my questioning of

10   them, in particular if we have to bring them up to the sidebar,

11   that I'll reiterate on the record who the particular juror is

12   and what their number is, and so you will never be placed in a

13   position where you're exercising a peremptory and you don't

14   know who is going to fill that seat, if I'm making myself

15   clear.

16           MR. QUIÑON:  Yes.

17           THE COURT:  As a trial lawyer, that was always my

18   nightmare.

19           MR. QUIÑON:  Thanks.

20           THE COURT:  Any other questions?

21           MR. QUIÑON:  Yes, sir.

22           You mentioned five rounds, and you also went over the

23   fact that the first round the government would exercise two

24   challenges.  I just want to go over that again, because as a

25   trial lawyer, you know you're not only concerned about the

HapWdiaC

1    person you're considering, you want to know what's coming

2    ahead.  That's very important.  So can you please explain?

3    After they're seated, I imagine, and we ask all the questions

4    and we take care of the challenges for cause and now we're

5    ready to do the peremptory challenges, the government, as I

6    understand it, would come first.

7                THE COURT:  Right.

8                MR. QUIÑON:  And they would have to exercise two.

9                THE COURT:  Two challenges in the first round.

10                MR. QUIÑON:  Right.

11                THE COURT:  And then there are four more rounds.  They

12    have a total of six challenges, so they get one challenge in

13    each successive round.

14                MR. QUIÑON:  OK.

15                THE COURT:  So you get to see two of the government's

16    challenges before you make any challenge.

17                MR. QUIÑON:  Right.

18                THE COURT:  And when you make a challenge, you don't

19    have to make them in any numeric order.  You can choose anybody

20    out of the 28 to knock out.

21                MR. QUIÑON:  That's important.

22                THE COURT:  In any order.

23                MR. QUIÑON:  That's important.  OK.

24                THE COURT:  And you'll be exercising those challenges

25    outside of the presence of the panel.

HapWdiaC

1          MR. QUIÑON:  Right.

2          THE COURT:  We will do it in the robing room or we'll

3    do it in this courtroom before we let the jurors come back in.

4    It just depends upon the timing.  Then I will bring all the

5    jurors back in and I will excuse all of the jurors who have

6    been challenged peremptorily, and I will reseat the jury as

7    it's configured, from the board, and then I will ask each side

8    whether they consent to this jury of 15.  It will be 15 to hear

9    and decide the case.

10          MR. QUIÑON:  One last clarification on the rounds of

11   challenge.  You mentioned that if a challenge is not exercised,

12   it's waived.

13          THE COURT:  Right.  Let's say in the third round you

14   decide to only exercise one challenge, you've lost that.  You

15   can't put that challenge in the bank for a subsequent round,

16   but you have not forfeited the right to your challenges in

17   rounds 4 and 5.

18          MR. QUIÑON:  OK.

19          THE COURT:  What will then happen, since all

20   challenges will not have been exercised, is that the lowest

21   seated 12 of the first 28 will comprise the jury.

22          MR. QUIÑON:  OK.

23          Thank you, sir.

24          THE COURT:  All right.

25          MR. QUIÑON:  Concerning the actual selection of the

HapWdiaC

1    panel, the Court does all the questioning, or will the Court

2    extend time for counsel to do any questioning at all?

3            THE COURT:  I do all the questioning.  I reserve that

4    privilege for myself.  I will ask you at the sidebar, when I've

5    completed all the questioning of the jurors, whether you have

6    any additional question that you want me to pose to the panel

7    as a whole or a question that you want me to pose to a

8    particular juror, because of something that that juror may have

9    said that prompts you to want me to explore further.  A lot of

10    times, we're considering that up at the sidebar.  And I'll do

11    it now, in case I forget later.  I'll ask counsel to consent

12    when it comes to sidebar conferences, both at the trial and

13    during jury selection, and that you agree that your clients

14    should remain at counsel table.

15            MR. QUIÑON:  Yes.  We will consent to that.

16            MR. FLYNN:  So agreed.

17            THE COURT:  All right.

18            Now, let me turn for a few minutes to the trial

19    itself, because when I saw the Bates number attached to the

20    ledger sheet that was a 127,000-some-odd number, I started to

21    think to myself, what is this case going to be for a jury?

22            First of all, how many trial exhibits does the

23    government expect?

24            MR. DISKANT:  Considerably fewer than that, your

25    Honor.  I think at this point we're hoping to have no more than

HapWdiaC

1    a couple hundred total exhibits and potentially considerably

2    less than that.  We're still finalizing our list, but we are

3    not going to be anywhere near the number of the Bates range

4    you're talking about.

5              THE COURT:  All right, but I understand that there are

6    going to be a number of bank statements put in that can run to

7    the hundreds of pages.  Do we really need to put a

8    multi-hundred-page bank statement into evidence when you're

9    only going to point, perhaps, to one page?

10             MR. DISKANT:  Your Honor, we would be happy to explore

11   with defense counsel whether there's a workaround.  Provided

12   that there wouldn't be any suggestion that the government had

13   only shown you one page of this account, I think we'd be open

14   to just offering the relevant page or pages.

15             THE COURT:  All right.  I'd like everybody to think

16   about things like that, because a jury's patience is not

17   inexhaustible.

18             Will all of the exhibits be essentially presented to

19   the jury electronically?

20             MR. DISKANT:  The substantial majority, yes.

21             THE COURT:  Are the parties entering into stipulations

22   with regard to authenticity?

23             MR. DISKANT:  Yes, your Honor.

24             As I noted earlier, we're still working through the

25   particulars, but at this point, both parties anticipate that

HapWdiaC

1    there will not be any custodians of record or the like

2    testifying.

3        THE COURT:  All right.  How many witnesses does the

4    government contemplate calling?

5        MR. DISKANT:  Your Honor, right now we're at

6    approximately 12.

7        THE COURT:  Recognizing that the defendants are under

8    no burden to present any evidence or call any witnesses,

9    nevertheless, I'm just asking at this time, do either of the

10   defendants intend at this point to call witnesses?

11       MR. QUIÑON:  We haven't yet decided that, your Honor,

12   but if we do, it will not be an extensive case on our side.  We

13   have not yet decided, because as you can tell, the case is

14   humungous, and we're kind of working our way through it; it

15   hasn't been easy.  But if we do, we don't anticipate it will be

16   anywhere near what the government intends to put on.

17       THE COURT:  Mr. Flynn, anything?

18       MR. FLYNN:  Likewise, your Honor.

19       THE COURT:  All right.  I think that at a minimum, the

20   government should identify by next Friday the witnesses it

21   intends to call during the first day of trial and the order in

22   which they'll be called, because as soon as we complete jury

23   selection, I'll give the jury some preliminary instructions and

24   then we'll proceed to opening statements and the taking of

25   evidence in this case, and I'd like to see that there's an

HapWdiaC

orderly presentation of the case and that the defendants have notice of what witnesses are being called and in what order so that they can prepare appropriately to cross-examine them.

Of course, it goes without saying, Mr. Diskant, don't run out of witnesses.  OK?  Because we're going to show the jury that we're not wasting their time, and hopefully they will get the message that they're not going to waste our time either, so that they'll all be here ready to go at the designated moment.

Just a couple of other issues on sort of etiquette and the examination of witnesses.

Please, when you call a witness, please then take a seat at counsel table while the oath is administered to the witness.  I regard that as a solemn event, and everybody should be seated.

None of you have to request permission to approach a witness to hand him a document.  All right?  You just can't charge the witness and you can't hang out at the witness stand. Your questions should be directed to the witness from the podium.  During opening statements and closing arguments, you are free to wander wherever you want in the well of the courtroom, but during questioning, please be at the podium and use the microphone.  We've got a great sound system, but you need to make sure it's working to amplify your voice.

Cross-examination in my courtroom is wide open and is

HapWdiaC

not limited to the scope of direct.  That avoids the need to

recall witnesses.  It's only after cross-examination that

further examinations are limited to the scope of the preceding

round of questioning, so it's only on redirect that redirect is

limited to the scope of cross, and so on.

         Now, in terms of voir dire, the parties submitted a

joint proposed statement of the case.  I have made one or two

tweaks to it.  In particular, I am not lumping the defendants

together, and so I've changed a couple of words, and here's

what I propose to tell the jury:

         "This is a criminal case.  The government has alleged

that the defendants, Luis Diaz Jr. and Luis Javier Diaz,

through their Florida-based company, Miami Equipment, operated

an unlicensed money-transmission business and engaged in

international money laundering between 2010 and 2016.

         "Each defendant is alleged to have done so with and on

behalf of various individuals and entities based primarily in

Venezuela and other parts of Latin America.  Each of the

defendants denies these charges and has pled not guilty to

them."

         Is there any objection to that summary of the case?

         MR. QUIÑON:  No, your Honor.

         MR. FLYNN:  No, your Honor.

         MR. DISKANT:  No, your Honor.

         THE COURT:  All right.  Now, I'm going to inquire at

HapWdiaC

1   this time regarding any offer by the government of a plea and

2   the communication of that offer to the defendant.  I want each

3   of the defendants to listen carefully to my questions and the

4   answers that are given by counsel.

5            Mr. Diskant, did the government extend a plea offer to

6   either of the defendants in this case?

7            MR. DISKANT:  Yes, your Honor.  The government

8   extended offers to both defendants.

9            THE COURT:  And was it in writing?

10           MR. DISKANT:  Yes, your Honor.

11           THE COURT:  Do you have copies of those offers to mark

12  as exhibits?

13           MR. DISKANT:  I don't, your Honor.  I apologize.  We

14  can get those for the Court.

15           THE COURT:  Could you very briefly describe the terms

16  here for the record.

17           MR. DISKANT:  Certainly, your Honor.

18           Your Honor, each defendant was given an offer that

19  included a plea to Count Two of the indictment.  Count Two of

20  the indictment is the operation of an unlicensed

21  money-transmitting business, in violation of Title 18, United

22  States Code, Section 1960.  In consideration of the defendant's

23  plea to that count, the government was prepared to dismiss the

24  three other counts of the indictment.

25           THE COURT:  Mr. Diskant, what were the terms of the

HapWdiaC

1    agreement?

2              MR. DISKANT:  You mean the guidelines range?

3              THE COURT:  Yes.

4              MR. DISKANT:  The guidelines range for Count Two

5    exceeded the statutory maximum, and so the guidelines range was

6    60 months, which is the statutory maximum for Count Two.

7              THE COURT:  In the government's view, what is each

8    defendant's sentencing exposure if he proceeds to trial and is

9    convicted on every count?  And because this is a multiple-count

10   indictment, it may be most helpful if the government can break

11   it down by count.

12             MR. DISKANT:  Your Honor, the statutory maximum for

13   each of the counts is five years on Count One, five years on

14   Count Two, 20 years on Count Three and 20 years on Count Four,

15   for a total of 50 years' imprisonment.

16             THE COURT:  All right.  Thank you, Mr. Diskant.

17             Mr. Quiñon, did you give your client, Mr. Luis Javier

18   Diaz, a copy of the government's plea offer?

19             MR. QUIÑON:  Yes, your Honor.  I gave him a copy of

20   it.

21             THE COURT:  And did you discuss it with him?

22             MR. QUIÑON:  I discussed it with him extensively, and

23   I have in writing, aside from verbal response, I had him give

24   me his responses, in writing, right on the face of the plea

25   agreement itself.  Every page is initialed and the first page

HapWdiaC

1    is signed, and his desire not to accept the plea is there as

2    well.

3              THE COURT:  And have you discussed with him his

4    sentencing exposure if he went to trial and were convicted on

5    all counts?

6              MR. QUIÑON:  Yes, your Honor.

7              THE COURT:  And did you make any recommendation to the

8    defendant as to whether he should accept or reject the

9    government's offer?

10             MR. QUIÑON:  The recommendation was that he needed to

11   weigh carefully both offers and that he needed to decide what

12   was the best for himself and his family.  And that was the

13   extent of the recommendation, and obviously discussing what the

14   different options were.

15             THE COURT:  All right.  Thank you.

16             Now, Mr. Luis Javier Diaz, have you been listening

17   closely to this colloquy?

18             DEFENDANT LUIS JAVIER DIAZ:  Yes.

19             THE COURT:  And have you taken any drugs, medicines or

20   pills, or consumed any alcoholic beverages in the last 24

21   hours?

22             DEFENDANT LUIS JAVIER DIAZ:  No.

23             THE COURT:  Is your mind clear today, sir?

24             DEFENDANT LUIS JAVIER DIAZ:  Yes.

25             THE COURT:  And you've heard the questions that I

HapWdiaC

1    placed to the government attorney and to your counsel and their

2    answers?

3        DEFENDANT LUIS JAVIER DIAZ:  Yes, sir.

4        THE COURT:  Was your attorney's account of his

5    discussions with you accurate?

6        DEFENDANT LUIS JAVIER DIAZ:  Yes, sir.

7        THE COURT:  And did you see the government's plea

8    offer and discuss it with your attorney?

9        DEFENDANT LUIS JAVIER DIAZ:  Yes, sir.

10        THE COURT:  Have you rejected the government's plea

11    offer?

12        DEFENDANT LUIS JAVIER DIAZ:  Yes, sir.

13        THE COURT:  Thank you very much.  You may be seated.

14        Mr. Flynn, if you would, sir, did you give your

15    client, Mr. Luis Diaz Jr., a copy of the plea offer from the

16    government?

17        MR. FLYNN:  Yes, your Honor.  Mr. Vila and I gave him

18    a copy of the written plea offer.

19        THE COURT:  And did you discuss it with him?

20        MR. FLYNN:  We discussed it with him at length, yes,

21    your Honor.

22        THE COURT:  Did you discuss his sentencing exposure if

23    he went to trial and were convicted on all counts?

24        MR. FLYNN:  Yes, your Honor.

25        THE COURT:  And did you make a recommendation to your

HapWdiaC

1    client as to whether he should accept or reject the

2    government's offer?

3              MR. FLYNN:  The only recommendation we've made was

4    that, as Mr. Quiñon already stated, he should consider his

5    family and what was in his best interests with knowledge as to

6    what the maximum sentence under the plea offer was and what the

7    potential sentence under the four counts was.

8              THE COURT:  All right.  Thank you.

9              Mr. Luis Diaz Jr., sir, would you stand.

10             DEFENDANT LUIS DIAZ JR.:  Yes, sir.

11             THE COURT:  Sir, have you taken any drugs, medicines

12    or pills, or consumed any alcoholic beverages in the last 24

13    hours?

14             DEFENDANT LUIS DIAZ JR.:  No, sir.

15             THE COURT:  Is your mind clear today?

16             DEFENDANT LUIS DIAZ JR.:  Yes, sir.

17             THE COURT:  Have you heard the questions I've placed

18    to the government attorney and your counsel and their answers?

19             DEFENDANT LUIS DIAZ JR.:  Yes, yes.

20             THE COURT:  And was your attorney, Mr. Flynn's account

21    of his discussions with you accurate?

22             DEFENDANT LUIS DIAZ JR.:  Yes, sir.

23             THE COURT:  Did you see the plea offer from the

24    government and discuss it with your attorney?

25             DEFENDANT LUIS DIAZ JR.:  Yes, sir.

HapWdiaC

1          THE COURT:  And have you rejected the government's

2     plea offer?

3          DEFENDANT LUIS DIAZ JR.:  Yes, sir.

4          THE COURT:  Thank you, sir.  You may be seated.

5          Now, are there any other issues that the parties wish

6     to raise with the Court?

7          MR. QUIÑON:  Your Honor, the only matter that I have

8     here, I know that both the defense and the government submitted

9     to the Court questions that we would like the Court to ask

10    during voir dire.  I just want to tell you that on behalf of

11    the defendants, and I speak for both defendants in this matter,

12    we object to the submission of the government to questions 41

13    and 42.

14         THE COURT:  Hold on one second.

15         MR. QUIÑON:  Yes, sir.

16         THE COURT:  Let me get them.

17         I don't happen to have the government's -- I guess I

18    do.  Hold on a second.

19         All right.  Your objection is to 41 and 42?

20         MR. QUIÑON:  Yes, your Honor, and I should add, 42, as

21    you can see, is referring to evidence that was obtained through

22    a search warrant.

23         Essentially the question is, basically it's an

24    instruction to the panel that you're instructing them that such

25    technique is proper and common, and so we object to that.  But

HapWdiaC

aside from objecting to it, I should tell you that we have
already told the government that -- we did not file a motion to
suppress, and we are not contesting any part of the legality of
the search warrant as such.

THE COURT:  All right.  I understand your objection.

Let me say this.  First, generally, I will, during
voir dire, tell jurors that certain evidence was obtained
through the use of a search warrant, and does any juror believe
that they couldn't be fair and objective based upon the fact
that the government used a search warrant.  I'm ad libbing
right now, but it's words to that effect, and that's intended
to weed out those who might feel that the government
overreaches.

When it comes to final jury instructions, I certainly
will tell the jury that they've heard evidence and received
evidence that was obtained through search warrants, and I will
instruct them that it was perfectly legal and that they can
consider that evidence.  But I won't be making that point
during voir dire.  The point in question 41, and just for the
record, question 41 reads:  "Would any of you be unable to
follow the judge's instructions that the government is not
required to use any particular investigative technique in
presenting evidence of a crime?"

I'm not going to ask that kind of question during voir
dire, but in my final instructions, I will instruct the jury

HapWdiaC

1    that the government's not required to use any particular

2    investigative technique, and that the jury shouldn't speculate

3    why one technique was used or some other technique was not

4    employed by the government.

5            Typically in this district, we tell them that the

6    government is not on trial here, and that's intended to let the

7    jurors who think that every trial should be like they see on TV

8    and every collection of evidence should be like they see on

9    CSI.  OK?  We all know the real world doesn't work that way, so

10   you don't have to worry about that on voir dire.

11           I hope that responds to your inquiry.

12           MR. QUIÑON:  Yes.

13           THE COURT:  Mr. Flynn.

14           MR. FLYNN:  Your Honor, during the trial, may we have

15   a standing rule that an objection made by one defendant is

16   considered made by both defendants unless the other defendant

17   withdraws from the objection?

18           THE COURT:  Because each defendant has to be

19   considered separately by the jury, I generally think it's

20   better for each lawyer to simply stand up and say objection.

21   OK?  We don't leave anything implied in the record, so in that

22   regard, you raise another good point that I should mention.

23           Even if you've agreed to the admission of certain

24   exhibits into evidence, it is incumbent upon the government to

25   offer the exhibit, have a witness identify the exhibit in some

HapWdiaC

fashion, and then even though it's coming in by agreement, I

will ask defense counsel whether you have any objection, and

you'll stand up and say "no objection."  In that way, the jury

will see how each and every exhibit at this trial comes into

evidence and will know the parties' position on it.  There will

be no dumping of exhibits into the record.  The jury will know

something about what the exhibit is.

At the conclusion of the trial, I do not send all of

the exhibits into the jury room.  I send only a list of the

exhibits that were received in evidence.  Then it's up to the

jury to send us a note as to what exhibits they wish to see,

and then we will send them in.

If the jury wants to hear any testimony read back to

them, testimony will only be read back to them here in the

courtroom.  I do not send some portion of the transcript back

to the jury.

Are there going to be any recordings in this case?

MR. DISKANT:  No, your Honor.

THE COURT:  All right.  You should be thinking about

that list of exhibits and how they are described, because

ultimately, before we send the list of exhibits in to the jury

during their deliberations, I will ask each side to consent to

the list and the way in which each exhibit is described, so

that we avoid argument on adjectives in an identification of an

exhibit.

HapWdiaC

1          Any other questions, Mr. Flynn?

2          MR. FLYNN:  No, your Honor.

3          THE COURT:  All right.

4          Anything from the government.

5          MR. DISKANT:  Just one, your Honor.

6          I understand the Court intends to reserve on this

7    issue of whether or not the government's expert can identify

8    particular individuals.  Hearing defense arguments today, the

9    government has a slightly further understanding of the concern.

10   With the Court's permission, we would just like to put in a

11   letter for the Court's consideration further articulating our

12   view of why that particular evidence is relevant and important.

13         THE COURT:  That's fine.  I'm willing to take letters

14   from either side at any time between now and trial.

15         Only because Monday the day of jury selection will be

16   a day that I can't control precisely when we're going to get a

17   panel up here, on that day, you need be in the courtroom only

18   at 9:30.  All right?  Because we'll have some time then to

19   discuss issues before we get a panel up here.  Customarily,

20   depending upon how many juries are being selected on November

21   6, they could be up here shortly before 10:30 or somewhat after

22   10:30, so that should give us plenty of time to clear anything

23   else up.

24         Any other questions?

25         MR. DISKANT:  Not from the government.

HapWdiaC

1          THE COURT:  Anything further from the defendants?

2          MR. QUIÑON:  No, Judge.  I just wanted to ask,

3    thinking far, and hopefully we won't get there, I was thinking

4    of Thanksgiving because of the flights and all that, what your

5    plans were.

6          THE COURT:  If we're there, aside from being

7    disappointed, I'll tell you this.  We will not try the case or

8    have the jury deliberate on the Wednesday before Thanksgiving.

9    Whether evidence is being presented or the jury is

10   deliberating, if we don't have a verdict by Tuesday evening,

11   November 21, the jurors will be returning on November 27,

12   Monday.  And I leave it up to jurors as to whether they want to

13   work beyond 5:00.  I ask them to send me a note if they choose

14   to do so.  Otherwise I give them some instructions, send them

15   home at 5:00 and have them return at 9:30 the next morning to

16   resume their deliberations.

17          Now, with respect to the charge, there were some

18   issues in the charge.  Have they all been resolved?  I know I

19   received a supplemental charge from the government.  What are

20   the basic areas of disagreement at this moment?  And I have the

21   document, No. 38, before me, which was the joint request.

22          MR. DISKANT:  Your Honor, I think there are a number

23   of more modest language differences throughout.  I think the

24   primary substantive disagreement, and even there it's not

25   enormous, but there is one, is with request No. 6, which deals

HapWdiaC

1    with the first time the jury's instructed on the issue of an

2    unlicensed money-transmitting business.

3              THE COURT:  All right.

4              MR. QUIÑON:  No. 6, yes, that's an issue.  That's the

5    definition of a money-transmitting business, and we have

6    different -- it's really a language issue, whether it's going

7    to be the statutory language or not, which is what we set forth

8    in our proposal, and so the Court needs to make a determination

9    of that definition, which is obviously very important in this

10   case.  That's what the case is about, so yes, I think there are

11   other differences, but No. 6 right now is looking to be

12   probably the most important of all the differences that we're

13   having.

14             THE COURT:  All right.

15             MR. QUIÑON:  We had No. 7, but we were able to resolve

16   it.

17             THE COURT:  All right.  I will work on that.

18             I should say that, first, it's the custom in this

19   district to send a copy of the indictment or redacted

20   indictment into the jury room for the jury to have during its

21   deliberations.  Accordingly, it is my custom not to read

22   portions of the indictment to the jury; the charge is long

23   enough.  I noted that in a number of places the Court's invited

24   to read portions of the indictment to the jury.  I'm not going

25   to do that.

HapWdiaC

1          Anything else?

2          Thank you for coming in.  I'll see you all at 9:30 on

3    November 6, and if anything arises between now and then, let me

4    know by letter with respect to any issues.

5          MR. QUIÑON:  Thank you.

6          THE COURT:  Have a good afternoon.

7          (Adjourned)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25