UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

                                            :

UNITED STATES OF AMERICA

                                            :

        - v. -                                   17 Cr. 077 (WHP)

                                            :

LUIS DIAZ, JR, and
LUIS JAVIER DIAZ,                            :

                  Defendants.      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

 

## **<u>GOVERNMENT'S SENTENCING MEMORANDUM</u>**

 

                                           GEOFFREY S. BERMAN
                                           United States Attorney for the
                                           Southern District of New York
                                           One St. Andrew's Plaza
                                           New York, New York 10007

Edward B. Diskant
Daniel M. Tracer
Benet J. Kearney
Assistant United States Attorneys
    -- *Of Counsel* --

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in advance of sentencing in this matter scheduled for June 19, 2018.  This Court is well aware of the facts of this case having presided over a two week jury trial in November 2017 at which both defendants were convicted of operating an unlicensed money transmitting business, in violation of 18 U.S.C. § 1960, and international money laundering, in violation of 18 U.S.C. § 1956.  As the trial evidence demonstrated, defendants Luis Diaz, Jr., ("Diaz") and Luis Javier Diaz ("Javier"), father and son, used their family-owned business, Miami Equipment & Export Co. ("Miami Equipment"), to operate an unlicensed money transmitting business that sent over a hundred million dollars to individuals and entities all over the world, including shell companies, Venezuelan government officials, and others with whom Miami Equipment had no *bona fide* business relationship.  The defendants also charged fees for this service, amounting to over a million dollars during the relevant period.

In operating their money transmitting business, the defendants failed to obtain a license, thereby allowing the funds transfers to be sent into and out of the United States without the oversight usually attendant to the transfer of funds through the U.S. financial system, including the exercise of due diligence, background checks on the senders (also known as "know your customer" or "KYC"), and the filing of suspicious activity reports as mandated by the Financial Criminal Enforcement Network ("FinCEN").  Furthermore, these transfers by Miami Equipment were conducted pursuant to fake invoices and sham contracts, dozens of which were recovered by law enforcement during a search of the defendant's offices.  By sending money overseas to promote this illegal business, the defendants also committed international money laundering. As more fully set forth below, the Government believes that these crimes warrant a substantial

period of incarceration, albeit one that is below the calculated Guidelines range, in addition to the mandatory imposition of criminal forfeiture.

## Statement of Facts

The defendants were charged in Indictment 17 Cr. 077 with one count of conspiracy to operate an unlicensed money transmitting business, one count operating an unlicensed money transmitting business, one count of conspiracy to commit money laundering, and one substantive count of committing international money laundering. The defendants were the owners of Miami Equipment, a family-owned export company located near Miami, Florida. In addition to its export business, the defendants used Miami Equipment to transmit over $100 million on behalf of various individuals and entities around the United States and abroad, in exchange for fees. The defendants' main money transmitting client was KCT, a Venezuelan construction consortium that directed the movement of many millions of dollars through Miami Equipment.

Most of the factual evidence at trial was not hotly contested. Undisputed evidence at trial showed that neither the defendants nor Miami Equipment were ever licensed to engage in money transmitting services. Money transmitting businesses are required to be licensed in order to serve as the first line of defense against the cooption of the U.S. financial system for money laundering and criminal activity. By failing to obtain a license, the defendants thus provided an alternative means for its clients, mainly KCT, to move funds into and through the United States without being subject to that oversight, including, for example, the kinds of diligent know-your-customer obligations and suspicious activity report filings that a registered money services business would have had to file.

The typical method that the defendants used to transmit funds was clearly documented in emails, invoices, and wire transfers, and followed a consistent pattern. First, an email would be

sent from KCT to the defendants' attention at the "ljdiaz@miamiequipment.com" email address. At times, these emails were also directed to the "javier@miamiequipment.com" email address. The email would typically contain information about some or all of the following components: how much money the defendants would be receiving from KCT, the amount of the fee that Miami Equipment was entitled to keep, and the amount of money to be sent to particular recipients. These emails also usually included a fake invoice purporting to document some good or service that the recipient was providing to Miami Equipment in exchange for the payment. The invoice usually recited a generic service, like consulting. In fact, Miami Equipment had no consultants. When the Government executed a search of Miami Equipment's offices, agents found dozens of hardcopy version of these invoices, many in Diaz's office. The defendants would then follow through on the instructions in the email by wiring the funds. Notably, the only three signors on Miami Equipment's bank account were the defendants and their daughter/sister Annette Diaz Rojas.

In addition, the defendants had fake contracts with some of the larger recipients of the money sent by KCT, contracts which purported to document a business relationship with Miami Equipment that would explain why Miami Equipment was sending these companies tens of millions of dollars. There was, however, no genuine business relationship. Instead, Miami Equipment's job was simply to transfer the funds at the direction of KCT. In exchange, Miami Equipment kept approximately a one percent fee of the funds transferred.

The evidence at trial also demonstrated that these many of these transmissions bore significant suspicious indicia and red flags. In other words, they were the type of transactions that a registered financial institution would be required to report. First, many of the payments were made to shell companies in overseas jurisdictions that would typically raise a red flag. For

instance, the defendants facilitated the transmission of over $30 million to Adinar, a company purportedly located in the British Virgin Islands and owned by one of the principals of KCT. Second, many of the transmissions were made to people who worked in the Venezuelan government – for example, Fidel Ramirez, Rafael Enrique Cid, and Teddy Peralta. Third, many of the transmissions were made from KCT to KCT employees. For instance, the defendants transmitted money from KCT to Elisbert Becerra – the KCT employee who was directing most of the transfers and was in direct contact with the defendants – pursuant to an invoice falsely asserting that Becerra had provided consulting services to Miami Equipment. Simply put, the defendants were acting as these people's bank accounts, and in doing so, they failed to live up to the obligations of a legal, registered money services business.

The defendants also conducted transactions to move money on behalf of other, non-KCT clients, that often involved simply moving funds from overseas accounts into the entities' U.S. accounts. For instance, the defendants facilitated the transmission of funds in this manner on behalf of South American companies Alimentacion Balanceada and Taller Importaciones. Substantially all of these transactions entailed emails sent exclusively to the javier@miamiequipment.com address – one trial testimony established was used primarily by the defendant Luis Javier Diaz. In total, the defendants moved more than $100 million on behalf of their customers and collected fees for those transfers totaling over $1 million.

Following trial, the jury convicted Diaz of all four counts, and convicted Javier of counts two and four, the substantive counts of the operation of an unlicensed money transmitting business and international money laundering.

## Application of the United States Sentencing Guidelines

The first stage of sentencing requires the Court to calculate the recommended sentence under the United States Sentencing Guidelines (the "Guidelines" or "USSG"). The Guidelines "are the starting point for every sentencing calculation in the federal system." *Hughes v. United States*, No. 17-155, 2018 WL 2465187, at *8 (U.S. June 4, 2018); *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) ("The Guidelines provide the starting point and the initial benchmark for sentencing . . . and district courts must remain cognizant of them throughout the sentencing process.") (internal quotations omitted).

The Government agrees with the Probation Office that the total offense level here is 34 for both defendants and that they are each in criminal history category I. All the counts of conviction – counts one through four for Diaz, and counts two and four for Javier – are grouped for Guidelines purposes inasmuch as the offenses involve many of the same acts and transactions, a common criminal scheme or plan, and because the offense level for all these crimes is determined largely on the basis of aggregate harm (the "Group"). USSG § 3D1.2(a), (b), and (d). Because the Guidelines analysis of international money laundering produces the highest offense level, that Guideline for that offense is used to determine the offense level of the Group. *Id.* § 3D1.3(a), (b).

International money laundering is governed by USSG § 2S1.1. Because the defendants were both convicted of the "underlying offense," namely, the operation of an unlicensed money transmitting business, the base offense level is the offense level for that crime. *Id.* § 2S1.1(a)(1). The operation of an unlicensed money transmitting business is governed by USSG § 2S1.3. Pursuant to USSG § 2S1.3, the offense level is six plus the number of offense levels from the table in USSG § 2B1.1 corresponding to the value of the funds. *Id.* § 2S1.3(a)(2). Here, twenty-

four levels are added for a value of funds exceeding $65 million, but not exceeding $150 million. *Id.* § 2B1.1(b)(1)(M). Accordingly, the base offense level for the Group is 30.

Two levels are added because each defendant was convicted under 18 U.S.C. § 1956. *Id.* § 2S1.1(b)(2)(B). Another two levels are added because the conviction was under 18 U.S.C. § 1956, and the offense involved sophisticated laundering. *Id.* § 2S1.1(b)(3). Accordingly, the total offense level for the Group if 34. Because neither defendant has any known criminal history, they are each in criminal history category I. With an offense level of 34 and a criminal history category I, the recommended Guidelines range for each defendant is 151 to 188 months' imprisonment. Of note, the United States Probation Office has recommended a sentence of 60 months' imprisonment for each defendant.

In both their objections to the PSR and in their submissions to the Court, the defendants lodge a few objections to this Guidelines calculation, none of which have merit.

   a. Javier's Challenge to the Value of Funds

Defendant Javier challenges the value of the funds giving rise to a 24-level enhancement to the base offense level under USSG § 2S1.1(a)(1). (*See* May 25, 2018 Defendant Luis Javier Diaz's Sentencing Submission ("Javier Mem." at 2.) In particular, Javier argues that the approximately $100 million figure used by the Probation Office to calculate the offense level comes primarily from "wire transmissions involving the KCT consortium" and that "[t]hese KCT transactions were handled independently by this father, Luis Diaz, Jr." (*Id.*) Javier argues that this assertion is supported by trial evidence demonstrating that Diaz was the individuals with Miami Equipment's primary relationship to KCT, and based on the jury's verdict acquitting him of conspiracy charges, thereby demonstrating that "the jury was not persuaded that Luis Javier jointly participated with his father in the KCT transactions." (*Id.* at 2-6.) Instead, Javier argues

that, at most, the evidence demonstrates his participation in a single unlicensed transmission – the one conducted on behalf of Taller Importaciones for $69,975 – and that his Guidelines calculation must be capped accordingly.  This argument is inconsistent with the law and the facts of this case.

As a preliminary matter, Javier's account of what the jury convicted him of is impossible. In providing the definition of an unlicensed money transmitting business to the jury, this Court explained that: "A 'business' is an enterprise that is carried on for profit or financial gain.  Thus, *a single isolated transmission of money is not a business* under this definition."  (Tr. at 1046 (emphasis added).)  In other words, the jury was instructed not to convict Javier unless it found that he had engaged in the business, *i.e.*, a continuing enterprise, of money transmission.  Had the jury only found him responsible for a single transaction, they would have acquitted him entirely. Their finding of guilt thus necessarily demonstrates their finding that Javier was responsible for numerous unlicensed money transmissions.

This Court determines the value of funds applicable to the money laundering Guidelines based on the "preponderance of the evidence."  *United States v. Thorn*, 317 F.3d 107, 117 (2d Cir. 2003).  The evidence at trial that Javier was involved in transmitting over $100 million plainly meets that standard.   First, the evidence shows that emails concerning many of the illegal transmissions were sent and received by Javier.  With respect to non-KCT transactions, such emails abound.  (*See, e.g.*, GX-121-2-T; GX-122-T; GX-124-T; GX-129-T.)  With respect to KCT-transactions, the evidence also shows that Javier was involved in the communications on numerous occasions.  Specifically, when emails relating to KCT payments were sent to Miami Equipment, they typically arrived at an email address that was used by both Diaz and Javier ("ljdiaz@miamiequipment.com").  (Tr. 491, 767.)  Further, some of these emails about the KCT-

related transmissions were subsequently forwarded to another email address used exclusively by Diaz ("luisd300@bellsouth.net").  (*See, e.g.*, GX 103-1-T, 104-T; Tr. 779, 786.)  Yet other emails concerning KCT-related transmissions were forwarded to another email address used exclusively by Javier Diaz ("javier@miamiequipment.com").  (*See* GX-113, -113-T; Tr. 253-55, 409.)  Moreover, in certain instances the same javier@miamiequipment.com used exclusively by Javier Diaz was used to transmit fraudulent certifications to KCT, falsely indicating that tens of millions of dollars transmitted by KCT to Miami Equipment were for equipment and goods actually sold by the defendants when, in fact, no such transactions actually occurred.  (*E.g.*, GX 101-T).  These certifications alone indicate Javier Diaz's knowledge of the magnitude of the crime. Furthermore, the evidence at trial showed that these funds went through Miami Equipment's bank account for which the only signors were Luis Diaz, Jr., Luis Javier Diaz, and Annette Diaz (See GX-201A, -202), and that both Luis Diaz, Jr., and Luis Javier Diaz instructed that payments be made out of this account as part of the scheme (e.g., Tr. 479).

The fact that Javier was involved in some transactions in which no fee was charged is of no moment.  As the Government explained at trial, there is no requirement under 18 U.S.C. § 1960 that a "fee" be charged or collected.  (*See* Tr. 583-84; ECF Dkt. No. 47; *see also* 18 U.S.C. § 1960.)  Indeed, no such language appears in the statute.  (*Id.*)  Instead, payment of a fee can be properly considered by the jury, among other factors, in determining whether the defendants are operating a money transmission "business," rather than doing so as isolated or otherwise non-business conduct.  (*Id.*; *see also United States v. Banki*, 685 F.3d 99, 114 (2d Cir. 2012), as amended (Feb. 22, 2012).)  Here, the fact that a fee was explicitly contemplated and charged in many transactions demonstrates that the defendants were in fact running this operation as a business.  Accordingly, even additional transmissions without fees that may have been done to

8

maintain client relationships or engender goodwill should be considered part of the relevant conduct.

Furthermore, the evidence at trial showed that both defendants held control over the bank account through which most of the illegal transmission were conducted. For instance, most of the wire transfers featured at trial went through Miami Equipment's bank account for which the only signors were Luis Diaz, Jr., Luis Javier Diaz, and Annette Diaz. (GX-201A, -202.) Likewise, testimony at trial demonstrated that both Diaz and Javier instructed that payments be made out of this account as part of the scheme. (Tr. 479.) Accordingly, the evidence at trial provides a firm basis to find that both defendants were responsible for the over $100 million that were transmitted as part of the illegal money transmission business.

b. Both Defendants' Challenges to Sophisticated Laundering

Both defendants also challenge the Probation Office's inclusion of a two-level enhancement of sophisticated laundering under USSG § 2S1.1(3). (Javier Mem. at 6-7; May 25, 2018 Defendant Luis Diaz, Jr.'s Sentencing Memorandum ("Diaz Mem.") at 27-28.) Based on their submissions, it does not appear that either defendants seriously contests the sophistication of the overall criminal activity – an unsurprising position given the extensive use of shell companies and false documentation in this case – but rather, argue that the sophistication was the result of KCT's plan and design and was unknown to both Diaz and Javier. (Javier Mem. at 6, Diaz Mem. at 27-28.) This argument should be rejected.

The overall criminal activity proven at trial was certainly sophisticated. The evidence at trial showed that the scheme involved tens of millions of dollars of payments to shell companies in offshore locations, and the use of multiple false invoices and contracts to hide the true nature of the payments. The conduct here thus meets nearly every factor that the Guidelines

recommend be taken into accounts to determine sophisticated laundering. *See* USSG §

2S1.1(b)(3), Application Note 5 (noting that "Sophisticated laundering typically involves the use

of—(i) fictitious entities; (ii) shell corporations; (iii) two or more levels of transactions . . . ; or

(iv) offshore financial accounts").

The evidence also showed that the defendants were far more familiar with these facts

than their sentencing submissions suggest. While the evidence did not show that the defendants

actually authored the false invoices or contracts, they were maintained and found in both

defendants' emails and in the physical presence of their office space. Moreover, the evidence

clearly shows that the defendants understood the falsity of these documents. For instance, one of

the fake invoices featured at trial suggested that Elisbert Becerra was providing consulting

services to Miami Equipment. (GX-115-T.) The defendants obviously knew this was false. She

was their point of contact at KCT for years. Likewise, the evidence at trial showed that the

defendants were included on emails where some of the invoices were altered in order to make

non-business expenses appear more legitimate. (*Compare* GX-108A-T *with* GX-108B-T.) Thus,

looking at all the evidence as a whole, there is a firm basis to conclude that the defendants

understood, or willfully avoided learning, that this was not simply the innocent movement of

funds; but rather, that there was intentional, complicated deception being carried on as part of the

criminal scheme. Accordingly, this two-level enhancement is warranted.

   c.   <u>Javier's Application for a Minor Role Reduction</u>

Javier also argues in favor of a mitigating role reduction pursuant to USSG § 3B1.2.

(Javier Mem. at 7.) This argument appears premised on the fact that Javier was supposedly

responsible for a far smaller portion of the criminal conduct than Diaz. (*Id.*) As set forth above,

however, the jury's verdict and the evidence at trial demonstrated that Javier's role was not

nearly so limited.  In light of Javier's actual role in the communications and his dealings with parties seeking to transmit money illegally, this argument should be rejected.

Moreover, this type of reduction should not be applied in the context of a two-person charge, and where the only comparison of culpability that can be made is to the defendant's coconspirator.  *United States v. Yu*, 285 F.3d 192, 200 (2d Cir. 2002) ("[A] minor-role adjustment is not available merely on a showing that the defendant played a lesser role than his co-conspirators.") (internal quotations omitted).  This approach is further buttressed by the application notes to the Guideline which provide that culpability must be determined based on the "average participant."  USSG § 3B1.2 Application Notes 3(A).  Plainly, it is hard to compare the defendant to the "average" participant when there is only one other.

In addition, the mere fact that a defendant was not the one who personally moved a substantial portion of the funds does not meet the standard for a mitigating role reduction under the Guidelines.  The application note to the Guideline provide five non-exhaustive factors to consider in determining whether such a deduction may apply: "(i) the degree to which the defendant understood the scope and structure of the criminal activity; (ii) the degree to which the defendant participated in planning or organizing the criminal activity; (iii) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority; (iv) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts; [and] (v) the degree to which the defendant stood to benefit from the criminal activity."  *Id.* at 3(C).  Here, even if Javier was only personally involved in handling a portion of the illegal transmissions comprising the criminal scheme, evidence at trial showed that he participated in the emails that communicated the scheme

conduct, he had a significant amount of discretion and control over Miami Equipment's business and the use of its bank account, and Javier benefited just as much as Diaz when Miami Equipment profited through fees obtained by unlicensed money transmissions.  Accordingly, this reduction is not applicable.

Accordingly, the defendants' objections to the Probation Office's Guidelines calculations should be rejected.

### Application of the Sentencing Factors Under 18 U.S.C. 3553(a)

Once the Court has calculated the Guidelines, it must consider an appropriate sentence under the totality of factors set forth under Title 18, United States Code, Section 3553(a).  While the Court must calculate the Guidelines, it is "emphatically clear that the Guidelines are guidelines-that is, they are truly advisory."  *Cavera*, 550 F.3d at 189.  "A sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime."  *Id.* at 188.  "A district court may not presume that a Guidelines sentence is reasonable; it must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense."  *Id.* 189; *United States v. Genao*, 869 F.3d 136, 141 (2d Cir. 2017) ("The sentencing court must make an individualized assessment based on the facts presented.").

a.   A Substantial Term of Imprisonment is Appropriate

Here, application of the factors set forth in 18 U.S.C. § 3553(a) militate heavily in favor of a term of imprisonment.  *First*, a term of incarceration is appropriate here to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense. *See* 18 U.S.C. § 3553(a)(2)(A).  As detailed extensively above and as thoroughly established through the trial evidence, the defendants over a period of nearly five years used their equipment business

as a front to move more than $150 million into and through the U.S. financial system on behalf of their "customers" in Venezuela. Far from the innocent, regulatory mistake portrayed by the defendants in their submissions, the trial evidence unquestionably established that the defendants' conduct was knowing and intentional and was carefully designed to help them and their co-conspirators evade detection. Indeed, the Government offered dozens of fake, sham invoices created as a part of the scheme and maintained by the defendants in an effort to conceal the criminal nature of the conduct. The Court thus saw sham invoices purporting to document a business relationship between the defendants and various payees, including a series of shell companies controlled by KCT's officers and directors, invoices that were patently false and served no purpose other than to mask the unlawful and illegitimate nature of the transactions. The Court also saw sham contracts and certifications involving both defendants, documents that once again served no purpose except to conceal the criminal nature of the defendants' conduct.

Moreover, as the Government established at trial, there can be little question that the tens of millions of dollars' worth of transactions the defendants processed were, at the very best, highly suspicious in nature. For example, the Government highlighted numerous instances in which the defendants facilitated large transfers from KCT to Venezuelan government officials, transactions that both trial testimony and common sense make clear the defendants and their co-conspirators sought to conceal. Similarly, the Government highlighted dozens of instances in which the defendants facilitated large transfers from KCT to accounts for shell companies controlled by one or more KCT executives, people defendant Diaz, in particular, knew well. These transactions, which objectively make no business sense were clearly suspicious in nature, and were clearly sent to the defendants along with sham invoices (and a fee for the defendants to

keep) in an effort to conceal their suspicious nature.  A substantial sentence is thus appropriate to reflect the seriousness of the offense conduct.

*Second*, a substantial sentence is necessary to afford adequate deterrence to criminal conduct.  18 U.S.C. § 3553(a)(2)(B).  While the defendants plausibly contend they are unlikely to engage in further criminal conduct, general deterrence is an issue the Court should weigh heavily in imposing sentence in this case.  As the trial testimony established, the U.S. Treasury Department relies heavily on a structure of self-reporting and registration in order to protect the integrity of the U.S. financial system and to enforce various anti-money laundering laws and regulations.  Because it is far too easy for people like these defendants to skirt those regulations to turn a profit, the Court should send a strong signal to others who might be similarly inclined to break the law by using their accounts to operate as an unlicensed money remitter that, if they are caught, the penalties will include a significant period of incarceration.

In seeking a non-custodial term, the defendants make a series of arguments that are simply at odds with the trial evidence.  In particular, the defendants repeatedly assert that they had no criminal intent with respect to the offenses of conviction.  Luis Diaz, Jr., for example, argues that "any 'blame' in this case is isolated to Mr. Diaz *not having known better* about licensing his business – *i.e.*, at worst, having been careless" and that "a sentence of incarceration . . . is not called for."  (*E.g.*, Luis Diaz Sr. Submission at 22.)  That argument is simply inconsistent with the overwhelming evidence offered at trial that the defendants and their co-conspirators intentionally sought to mask their activities through the creation of sham invoices, contracts, and certifications, documents which served no purpose but to conceal the criminal nature of their conduct.  Indeed, far from an isolated incident or an "unintentional mistake[]" based on a misunderstanding of cultural and legal issues (*Id.* at 24), the defendants engaged in a

long-running, sophisticated scheme that involved repeated transfers and dozens of false documents, netting the defendants approximately a million dollars in fees in the process.

Moreover, that argument is equally inconsistent with the fact that the defendants similarly shielded their conduct from their own family members, including their daughter/sister Annette Rojas Diaz, who testified to her complete lack of knowledge regarding the defendants' extensive and criminal dealings with KCT, in particular.  Indeed, while extensively highlighting the family nature of the business, the defendants conveniently leave out the fact that the family wasn't involved in the *criminal* aspects of the business.

Equally spurious is defendant Diaz's suggestion that the jury's verdict "did not require his awareness that he was doing something illegal, or even wrongful."  (*Id.* at 20).  That is simply false.  As an initial matter, both conspiracy counts expressly required the jury to find that the defendant had reached a *criminal* agreement, *i.e.*, an agreement "to violate the law and to accomplish an unlawful plan."  (Tr. at 1044).  Moreover, with respect to the substantive count, the jury had to and did find that both defendants knowingly and intentionally operated Miami Equipment as a money transmitting business, (*e.g.*, Tr. at 1053-54), a conclusion that would be entirely inconsistent with a jury crediting that the defendants somehow unintentionally or mistakenly engaged in the charged conduct.  Finally, the Government presented this case to the jury from the outset as one involving intentional criminal conduct.  The Government repeatedly highlighted the fake and false documents used by the defendants as part of the scheme, and argued extensively from that evidence to the jury in both closing and rebuttal that it should conclude that the defendants had intended to break the law and to conceal their criminal conduct.  At no point did the Government suggest to the jury that it could or should convict the defendants

for having been "careless" or for "not knowing better."  Nor is there any basis to suggest the jury's verdict reflected any such understanding on the jury's part.

Accordingly, the Government believes that the imposition of a custodial sentence is necessary in this case to meet the goals of sentencing for these crimes.

b.  <u>The Court Must Enter an Order of Forfeiture</u>

In addition, the Court must order forfeiture pursuant to Title 18, United States Code, Section 982.  18 U.S.C. § 982(a)(1) ("The court, in imposing sentence on a person convicted of an offense in violation of section 1956 [] or 1960 of this title, shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property.").  In the wake of a 1960 conviction, a defendant must forfeit all funds "transferred in the unlicensed operation," or be ordered to pay forfeiture in that amount. *United States v. Elfgeeh*, 515 F.3d 100, 139 (2d Cir. 2008).

Here, the evidence at trial demonstrated that at least approximately $101,346,285.42 was transferred through the defendants' operation of an unlicensed money transmitting business. (*Compare* GX-403 (demonstrating a total of approximately $106,757,106.42 sent to Miami Equipment by KCT during the relevant period) *with* GX- 308 (showing total of approximately $5,410,821 worth of exports to KCT and KCT-affiliated entities by Miami Equipment).) Accordingly, the Government requests that the Court enter the proposed Preliminary Orders of Forfeiture as to Specific Property/ Money Judgment (the "forfeiture orders").  The forfeiture orders would forfeit $367,769.35 from Miami Equipment's bank account (the "specific property") – the same account through which a substantial portion of the illegal money transmissions had been routed through – that had been seized by the Government prior to trial as well as impose a money judgment in the aforementioned amount of $101,346,285.42 (the

"money judgment").  The specific property was seized from Miami Equipment's bank account when the Government's investigation became overt and, accordingly, the criminal conduct came to an end on or about May 23, 2016.  The Government provided notice of its intention to forfeit these funds pursuant to 18 U.S.C., section 982 in the Indictment's forfeiture allegation.  The money judgment should be imposed to obligate the defendants to repay the remainder of their forfeiture obligations.

## CONCLUSION

For the foregoing reasons the Government submits that a substantial term of incarceration, but one that is below the Guidelines range of 151 to 188 months, would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing for both defendants.

DATED:       June 11, 2018
             New York, New York

                                Respectfully submitted,

                                GEOFFREY S. BERMAN
                                United States Attorney

                        By: _____/s/_____
                                Edward B. Diskant
                                Daniel M. Tracer
                                Benet J. Kearney
                                Assistant U.S. Attorneys
                                Southern District of New York
                                Tel. (212) 637-2294/2329/2260